## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

MICHAEL PATTERSON, and TASHA PATTERSON,

      Plaintiffs,

vs.                                  CASE NO.:

FLORIDA DEPARTMENT OF CHILDREN AND FAMILIES,
CHILDNET, INC., a Florida Corporation, STATE OF FLORIDA, and
FLORIDA STATEWIDE GUARDIAN AD LITEM OFFICE,

      Defendant.

_____/

## **COMPLAINT**

Plaintiffs, MICHAEL PATTERSON and TASHA PATTERSON, by and through the undersigned counsel, sues Defendants, FLORIDA DEPARTMENT OF CHILDREN AND FAMILIES, CHILDNET, INC., a Florida corporation, STATE OF FLORIDA, and STATEWIDE GUARDIAN AD LITEM OFFICE, and allege as follows:

## **INTRODUCTION**

1.    This is an action for declaratory and injunctive relief arising from Defendants' deliberate, knowing, and malicious conspiracy to terminate Plaintiffs' parental rights on an expedited basis that failed to consider relevant and critical medical evidence, and which was rushed and motivated by certain Defendants' financial interests, in clear and deliberate violation of the civil and custodial rights and well-being of Plaintiffs and their minor children.

## **JURISDICTION AND VENUE**

2.     This Court has original jurisdiction to hear this matter pursuant to 28 U.S.C. §1331 and §1343 *inter alia*, in that this is a civil action arising under 42 U.S.C. §1983 to redress the Defendants' deprivation under color of law of the federal rights, privileges and immunities secured to the Plaintiffs by the Constitution and laws of the United States.

3.     The federal rights sought to be redressed are guaranteed by the First and Fourteenth Amendments to the United States Constitution. This Court also has jurisdiction pursuant to 28 U.S.C. §§2201 and 2202, as Plaintiffs seek declaratory and injunctive relief.

4.     Any and all state law claims contained herein are part of the same case or controversy giving rise to the federal law claims and therefore fall within the Court's supplemental jurisdiction pursuant to 28 U.S.C. §1367.

5.     Venue is proper in the United States District Court for the Southern District of Florida  pursuant to 28 U.S.C. Section 1391 as all Defendants to the litigation reside in the state of Florida, and all actions and/or omissions giving rise to the claim occurred and continue to occur in the Southern District of Florida.

## **PARTIES**

6.     At all relevant times, Plaintiff, MICHAEL PATTERSON, was a natural person residing in Broward County, Florida, within the Southern District of Florida.

7.     At all relevant times, Plaintiff, TASHA PATTERSON, was a natural person residing in Broward County, Florida, within the Southern District of Florida.

8.     At all relevant times, Defendant, DEPARTMENT OF CHILDREN AND FAMILIES ("DCF"), is a state agency charged with providing juvenile and foster care services to children and families in Florida, including within the Southern District of Florida.

9.      At all relevant times, Defendant, CHILDNET, INC. ("CHILDNET"), is a Florida corporation under contract with DCF to provide foster care services to children and families within the Southern District of Florida.

10.      At all relevant times, Defendant, STATE OF FLORIDA, is sovereign state that interferes with the parental rights of its citizens.

11.      At all relevant times, Defendant, STATEWIDE GUARDIAN AD LITEM OFFICE, is a state agency charged with providing legal and advocatory services to children and families in Florida, including within the Southern District of Florida.

## GENERAL FACTUAL ALLEGATIONS

12.      On July 19, 2022, the parents, Michael and Tasha Patterson, gave birth to twin baby boys, Ma. P. and Mi. P.[1]

13.      At the time the twins were born, the father's other son, then-eight-year-old M.P., Jr., also lived with the parents much of the time. The family was ecstatic about the new additions.

14.      The mother's pregnancy was complicated, as is often the case when there are multiple children born.

15.      The mother had severe gastroesophageal reflux and needed to be prescribed magnesium sulfate and other antacids, and she also had pre-eclampsia, gestational hypertension, anemia, and amniotic fluid disorders-polyhydramnios and oligohydramnios.

16.      Roughly a month before birth, the mother suffered a severe fall, dislocating her knee.

---

[1] Because the children are minors, initials will be used to referred to Pattersons' children.

17.     The twins were born in breech, had premature rupture of the membranes, were six weeks premature and required delivery via c-section.

18.     Both twins spent time in the neonatal intensive care unit at Joe DiMaggio Children's Hospital, colloquially referred to as "NICU," and additional time in couplet care at the hospital before they could go home with the parents.

19.     Mi. P., who was born with a hole in his heart, spent a few days in the NICU, and Ma. P., who presented with breathing and feeding issues, spent two weeks in the NICU.

20.     The twins suffered with what appeared to be serious reflux or GERD (gastro-esophageal reflux disease) and required special formula—difficult to obtain during the national formula shortage, as well as the medications famotidine, Mylanta, and Pepcid.

21.     In the first two months the children were home, the twins continued to struggle with extreme fussiness.

22.     Between July 26 and September 21, 2022, the parents made ten pediatric and hospital visits with their babies, and when being examined for their lack of weight gain, the advice was to add rice to their formula.

23.     Unfortunately, the twins were inconsolable, and the vomiting continued.

24.     On September 18, 2022, the parents took Mi. P. to Joe DiMaggio Children's Hospital as the baby continued to demonstrate extreme fussiness and trouble feeding.  There, the first indication that the babies suffered from injuries was presented.

25.     In addition to bruising, it was discovered that Mi. P. had a small liver laceration, rib fractures, and a small bilateral subacute subdural hematoma.

26.     Ma. P. was also then taken to the hospital and was found to have a bruise to the eye

(which the parents were aware of and provided explanation that M.P, Jr., the older son, would corroborate), fractures to the ribs, legs and arms in various stages of healing, and a skull fracture.

27.     The parents did not dispute the injury findings, and they were concerned to learn of the injuries themselves and had no idea how they occurred.

28.     As a result of the injuries, which ultimately healed on their own, without surgery, with recommended vitamin supplementation, the hospital imposed special handling conditions to prevent any further injuries.

29.     At this time, the cause of the infants' injuries was unknown, but the medical staff suspected the infants might have a genetic disorder, and thus, special handling precautions were implemented to reduce the risk of further injury.

30.     Even though there was unmistakable evidence that the infants' injuries were not due to any intentional harm by the Pattersons, on or about September 21, 2022, DCF nonetheless filed a petition for dependency in the 11th Circuit Court of Florida, in Broward County, Florida, seeking to shelter the children.

31.     The trial court upheld the petition and the two twin babies were taken from the Pattersons.

32.     Upon removal, the twins were placed with the maternal uncle, a paramedic working for the state as a fire marshal and fire inspector, and his wife.  M.P., Jr. was sent to live with his mother in Orlando, three-and-a-half hours away from his dad.  The parents were allowed to visit, supervised by the uncle, separately.

33.     During this time, ChildNet, Inc. held a contract with DCF to act as the lead agency delivering a "comprehensive array of child protection and child welfare services as defined in s.

409.986 and 409.988, Florida Statutes (F.S.)," including foster care and adoption services.

34.     ChildNet, Inc.'s contract with DCF paid incentives if ChildNet, Inc. was able to have children assigned to its care placed for adoption within twelve months, and thus, ChildNet, Inc., DCF, and the State of Florida created a system that prioritizes rushing to terminate the custodial and civil rights of parents rather than conducting a diligent and thorough search for the truth regarding the cause of harm to a child.

35.     Ma. P., Mi. P., and M.J. were all placed under the supervision of ChildNet, Inc..

36.     As it was incentivized to do, on October 3, 2022, the State of Florida, DCF, and ChildNet, Inc. rushed and filed an expedited termination of parental rights petition against the Pattersons prior to any concrete determination of the cause of the minor children's injuries.

37.     Although the State attributes the injuries to the parents, new fractures were found on both twins two weeks *after* the removal and placement with the uncle - Mi. P to his ribs, jaw, and hands and on Ma. P. to his foot, elbow, and ribs.  The twins were taken back to the hospital on October 4, 2022.

38.     Despite the fact that the children continued to have injuries while outside the Pattersons' care, strongly supporting the conclusion that a medical cause for the injuries was at play rather than abuse, ChildNet, Inc. and DCF purposefully ignored this evidence and continued with their expedited petition for termination of parental rights against the parents as to all three children.

39.     ChildNet, Inc. and DCF were fully aware that any genetic testing of the twins to discover any bone diseases could take months to complete.  Yet, fully aware that they could be terminating the fundamental rights of innocent parents, ChildNet, Inc. and DCF continued to

proceed with the expedited termination proceedings.

40.     On October 28, 2022, it was discovered that Ma. P. suffered yet *another injury*, this time a clavicle fracture.   Dr. Stricker, the expert retained by the parents' former counsel, estimated that it occurred around October 4th.  Put another way- the twins were in the hospital from October 4th to October 13th during which time the fracture existed but was not detected.

41.     The only logical conclusion is that the injury occurred while Ma. P. was in the hospital, otherwise the clavicle fracture would have been detected when Ma. P. was brought in for examination.

42.     Even though there was evidence of two additional sets of injuries (three sets really, between the children), after the removal from the parents, DCF did not dismiss or delay the termination proceedings, but instead continued to rush to terminate the Pattersons's fundament rights, at the urging of and in conjunction with ChildNet, Inc., who had a financial incentive to pursue expedited termination.

43.     The termination case moved forward quickly and went to trial on February 8, 9, and 10, 2023.

44.     The Guardian ad Litem volunteer assigned, Margaret McFarlane, was a retired nurse practitioner who had considerable medical knowledge and a thorough understanding of the medical issues in the case.

45.     The Guardian actively participated in the case and attended hearings; however, the GAL's attorney intentionally failed to provide Mrs. McFarlane with the Pattersons' filings that opposed the TPR.

46.     Mrs. McFarlane was against the termination proceedings as she could see that the

proceedings were being unnecessarily rushed without sufficient due process and without a sufficient basis due to the then-unknown cause of the minor children's injuries.

47.     The Statewide Guardian Ad Litem's Office ("GAL") was aware that Mrs. McFarlane opposed the termination proceedings.

48.     GAL's own protocols called for it to hold internal staffing to be held if there was a disagreement within the GAL program.

49.     That protocol was not followed here, and instead of timely conducting the appropriate internal staffings, the GAL terminated Mrs. McFarlane because she did not support the termination of the Pattersons' parental rights.

50.     GAL's actions robbed the Pattersons and the minor children from an experienced independent voice during the TPR proceedings in furtherance of ChildNet, Inc.'s financial incentive to rush to terminate the parental rights of the Pattersons, and the State's, GAL's, and DCF's goal to expedite the termination of parental rights in a constitutionally defective manner that did not afford due consideration to possible alternative causes for the harm to the children.

51.     It should be noted that Ms. McFarlane was not the only guardian assigned to the case who was against the termination of the Pattersons' parental rights.

52.     M.P. Jr.'s prior guardian, Victor Alvarez, testified against termination of parental rights, and then he was also removed from the case, which shows that the GAL engaged in a pattern of silencing any dissenting guardian ad litem voices in furtherance of the common conspiracy to expedite parental and custodial rights of parents.

53.     Additionally, DCF did not subpoena the hospital records until early November, leaving the parents and their counsel a mere three months to truly prepare for this trial involving

complex medical issues, in which they had to determine the then-unknown cause of the minor children's injuries.

54.     DCF's key witness against the parents was Dr. Jamelah Tucker, a pediatrician and director of the Child Protection Team, based at Joe DiMaggio Hospital.

55.     To say Dr. Tucker should not have been permitted to testify as an expert in a case of this magnitude is an understatement. She was inexperienced in this field having been at CPT for a brief time, only having diagnosed child abuse herself roughly twenty times and only having testified once before.  She was spread thin with administrative duties at several hospitals and her duties as a hospitalist. Moreover, there was not a single mention of her educational credentials or experience acquired before May, 2021.  Although the parents objected to her testifying as an expert in child abuse, she was allowed to do so without any evidence of her educational credentials.

56.     Dr. Tucker nonetheless testified that the twins' fractures were "highly specific for abuse."  She described both parents as being upset when they learned of the injuries.  She testified vaguely, without explanation or evidentiary support that the liver laceration would be the result of "trauma."  She, however, confirmed the second set of injuries that happened in early October, and opined that at least some of them were definitely new, such that they occurred outside the parents' custody.   Although it is factually impossible, Dr. Tucker inexplicably testified that these new injuries, occurring outside the parents' care, were somehow evidence of "continued intentional injury" by the parents!

57.     At the conclusion of the trial, the trial court terminated the parents' parental rights to the twins and their brother M.P., Jr., finding that the parents had committed "egregious" abuse. This order was signed on February 24, 2023.

58.     After the trial, upon receiving her genetic testing results, the mother saw an endocrinologist, Dr. Michael Holick, who diagnosed her with Ehlers Danlos Syndrome, hypermobile type ("hEDS"), which the doctor opined, would explain the injuries.  Upon such information the parents filed a motion for extraordinary relief, asking the court to either vacate the termination order or re-open it to consider the new evidence.

59.     Subsequently, not only were the children themselves diagnosed with hEDS but upon consultation and review by a geneticist and pediatrician, a second opinion was obtained by Dr. Marvin Miller, indicating that the twins appeared to have a metabolic bone disorder, for which the hEDS would be a factor, and the metabolic bone disorder would also provide an explanation for the injuries.  An amended motion for extraordinary relief was filed on April 10, 2023, to include the additional findings about the twins.

60.     Despite these findings, which should have been cause to reopen the entire proceedings for a full exploration into this possible cause of the minor children's injuries, the court re-opened the trial for the "*limited* purpose to allow presentation by the Parents of additional *limited* testimony of the two doctors, Dr. Holick and Dr. Miller." (emphasis added). The court also ruled that the Department and Guardian could "present appropriate rebuttal testimony, which may include additional witnesses," for which they would end up calling Dr. Bradley Tinkle.

61.     Although the parents were in the process of consulting with additional experts to seek confirmation of Dr. Holick and Dr. Miller's findings, they were told multiple times by the court, in no uncertain terms, they were limited to just the two doctors for the reopened trial, for the purpose of being allowed to testify as to their conclusions and that the evidence was otherwise "locked."  Thus, the Pattersons were denied a full and fair opportunity to be heard.

-10-

62.    This all occurred even though the initial trial was conducted without any information regarding the mother's genetic testing that should have reopened the trial to a full range of discovery and evidence on that issue as a possible cause of the children's injuries to protect against the State terminating the parental rights of innocent parents.

63.    Eventually, the trial court and parties would become aware that two additional doctors, Dr. Eli Newberger and Dr. Anthony Perszyk, who reviewed the records and agreed there was no evidence of child abuse and there were alternative explanations for the injuries, however the DCF and GAL continued to move forward in seeking termination, and the court kept the door closed to the parents for offering this additional evidence

64.    The court allowed the parents to call Dr. Perszyk to testify for the *Daubert* proceeding that was part of the re-opened trial, who would go on to testify that the principles and methodology used by Dr. Miller and Dr. Holick were "standard" the "bread and butter" and used the same standards and methodology as those in the field.  Again however, the parents were precluded from offering his ultimate conclusions.

65.    The court allowed the parents' doctors to survive the *Daubert* hearing and proceed to trial to testify about their conclusions.  The main point of contention between Dr. Holick and Dr. Tinkle was whether infants could be diagnosed with hEDS and whether that could cause fractures, both of which Dr. Tinkle did not agree with.   Dr. Tinkle acknowledged that there was no consensus about how to use the Beighton scale, the scale used to diagnose hEDS, yet was of the opinion Dr. Holick's method was wrong.  He also overlooked the fact that other doctors, including one whom Dr. Tinkle himself had enough confidence in to co-author an article, were using the same methods and coming to similar conclusions as Dr. Holick.

-11-

66.     As for Dr. Tinkle's disagreement with Dr. Miller, he stated that a lot of Dr. Miller's theories had "merits of truth" to them, but he felt Dr. Miller had "extrapolated" those theories, without Dr. Tinkle providing any specific explanation to explain his belief.  Dr. Tinkle did not possess the qualifications to speak to a lot of Dr. Miller's theories, such as the effects of magnesium sulfate which the mother had taken during pregnancy, what a short umbilical cord was or what its affect would be on the twins lack of movement and ability to increase bone strength in the womb, the implications of pre-eclampsia and breech position on bone strength, and a general lack of expertise on birth related complications.  Much of Dr. Miller's evidence was unrefuted by Dr. Tinkle or anyone.

67.     Despite the overwhelming abundance of new evidence on the record, again much of it uncontroverted, and despite the State having the burden of proof, the court proceeded with terminating the parents' parental rights, again.

68.     In its Amended Final Judgment, the parents noted that the court did not believe any of the fractures could have occurred from their birth, because the court relied on Dr. Tucker's testimony that Ma. P. had a chest x-ray at two days old that did not detect fractures.  In so doing, the court overlooked important context about this x-ray.  The x-ray was taken in NICU because Ma. P. was having breathing issues immediately after his birth.  The x-ray report indicated that there were "no *acute* osseous abnormalities." (emphasis added).  "Acute" defined within the medical community means having occurred within 0-4 days.[2]  The inclusion of the term "acute"

---

[2] National Library of Medicine:
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2267322/#:~:text=The%20care%20of%20acute%20%28and%20recurring%20acute%29%20injuries,subacute%20%285%E2%80%9314%20days%29%2C%20and%20postacute%20%28after%2014%20days%29.

means there could have been older, healing, callused, fractures, not mentioned, that would not meet the definition of "acute." Strangely, DCF did not introduce these records into evidence, despite introducing the rest of the twins' medical records.

69.    As a result of the allegations, the mother lost her employment and, therefore, her health insurance, which she did not have throughout 2023.

70.    Upon regaining health insurance in January, 2024 the mother, shortly thereafter, resumed treatment with her geneticist, now being aware of the condition she and her babies suffered from.  She met with geneticist Dr. Iman Forghani on February 19, 2024. During the appointment, Dr. Forghani and the mother discussed her and the twins' medical history, prompting Dr. Forghani to suggest the twins not only see a geneticist, but also a specialist in pediatric metabolic bone disorders. The parents found Dr. Pals, a geneticist and expert in rare bone diseases.

71.    Dr. Pals reviewed the medical records and images.  Consistent with the opinions of Dr. Holick and Dr. Miller, who believed at least some of the injuries occurred in utero and in the hospital, Dr. Pals conclusively found in the imaging that Ma. P. had rib fractures at two days old while still in the NICU at Joe DiMaggio Children's Hospital, shortly after his birth *with callus formation*, meaning they were already in the healing stage at birth.  In utero fractures would not have been considered "acute" by this radiologist and Appellants suggest that they were overlooked because the x-ray Ma. P. had was to look for answers about his breathing issues, not to look for fractures.

72.    Dr. Pals's March 27, 2024, report determined that the rib fractures existing at the time of Ma. P.'s removal were at least seven to nine weeks old.  Because Ma. P. was in the NICU for two weeks after their birth and with the parents for six, it is impossible that these fractures

occurred while in the parents' care.  Identical findings were made for Mi. P.'s rib fractures.  Again, he was in the hospital for the four days of his life followed by seven weeks with his parents, it is highly likely his fractures were from his time in utero, the birth, or his time in the hospital. Put another way, it is highly *un*likely that the parents injured their children.

73.     Dr. Pals also found that images of both twins showed evidence of "congenital accessory skull sutures and other defects of ossification" and this congenital accessory suture, something which most radiologists have never seen, had been "*misdiagnosed* as a skull fracture" in Ma. P.

74.     These accessory sutures also explain the brain bleed (which Dr. Tucker had previously testified could have been a birth injury), Dr. Pals explained as follows:

> "The accessory sutures are present from before birth, this is called congenital. **If these congenital skull defects are large, they cause the skull to be too flexible, which may lead to intracranial bleeding during birth, either due to compression of the skull in the birth channel, or due to handling of the baby during C-section**. The flexibility of the skull may later also lead to intracranial hemorrhage after minor trauma or normal handling."
>
> "**The skulls of both twins have a large number of craniotabes (thin spots in the skull) and other defects of ossification** (fig. 5, 6). In healthy babies, small numbers of craniotabes may also be found, but they normally disappear after a maximum of two to three months. The fact that the skull shows such a large number of defects, is convincing evidence of an acquired or genetic congenital brittle bone condition."

75.     Dr. Pals also found both twins had additional ossification defects in their imaging never previously mentioned, including, but not limited to Wormian bones.  Wormian bones, also known as "intrasutural bones" or "sutural bones," are extra bone pieces that occur within a suture (joint) in the skull.[3]  This is found where metabolic bone diseases and genetic disorders involving

---

[3] Clinical Anatomy Journal: https://onlinelibrary.wiley.com/doi/10.1002/ca.22262

the bone result in reduced skull ossification as seen in metabolic bone diseases and genetic disorders involving the bone.[4]

76.     Dr. Pals concluded:

"In the case of [Ma. P.] and [Mi. p.] there is **convincing evidence of a brittle bone disease** that has caused congenital malformations in the skull, including accessory sutures and craniotabes. **This bone disease has caused fractures** of the ribs and the long bones **due to normal handling** after birth. **There is no evidence whatsoever of abusive handling.**"

77.     Based on this newly discovered evidence, the Pattersons sought another motion for extraordinary relief.   Dr. Pals report was provided March 27, 2024, the parents filed their motion to Set Aside Termination of Parental Rights Final Judgment and Motion for New Trial Before a New Court, pursuant to Fla. R. Juv. Pro. 8.270(b) (Extraordinary Relief), the following day.

78.     Additionally, once the mother regained her health insurance, she resumed her care with her geneticist, Dr. Forghani. Dr. Forghani, aware of the situation with the family, advised the mother that there was new genetic testing technology that was not available at the time the mother and twins went through their first round of testing ahead of the termination trial.

79.     The previous familial whole genome sequencing was re-analyzed with the new technology, as well as the twins had new whole genome sequencing done, again to be analyzed with the new technology.   After receiving and analyzing the results, Dr. Forghani concluded that the twins suffered from a *newly discovered* genetic variant associated with fractures, called FN1.

80.     Dr. Forghani's interpretation was that:

[T.P], her brother and **both twins carrying a variant** of uncertain significance in FN1c.6479T>C p.Ile2160Th. This gene has been **associated with** a recently introduced autosomal dominant Spondylometaphyseal dysplasia, **corner fracture**

---

[4] *Id.*

**type**. Although the clinical significance of this specific variant remains unknown, unless we have more information about the condition and potential effect of this variant **it is impossible to conclude that fractures are caused as a result of assault.**

81.     Dr. Forghani explained that the twins' joint laxity is associated with permanent intrinsic connective tissue abnormality in the bone and gives them an increased risk of fracture, especially in their first six months before it begins to normalize.

82.     This was consistent with the prior testimony of the parents' experts Dr. Holick and Dr. Perszyk. Forghani also discussed how a mother with hEDS would have a hyper elastic uterus, corroborating Dr. Miller's description of mothers with hEDS having a soft uterus, that would significantly limit fetal bone loading- a theory both he and the Department's expert Dr. Tinkle agreed was imperative for forming bone strength in the womb.

83.      A new motion for extraordinary relief was filed based on Dr. Forghani's new evidence incorporating the latest scientific discovery.

84.     The trial court, however, once again denied the parents' motion *without a hearing*. The court primarily based its denial on Dr. Forghani's description that the newly discovered variant was of "uncertain significance."  The parents filed a motion for reconsideration, explaining that the medical terminology "uncertain significance" did not mean "no significance" and also did not mean it could not be of "great significance," but rather it meant that the gene had just recently been introduced and further research needed to be conducted.

85.     The court also justified denial on the mistaken finding that Dr. Forghani's opinions were based on "previously known" or "previously available" information. The Court seemed to (erroneously) believe that the whole genome sequencing previously done was simply

"reinterpreted" by Dr. Forghani.  It was not.  Rather, it was 1) a re-analysis of the prior familial sample with the *new technology* in addition to 2) a completely new sample of the twins being analyzed *for the first time* with the new technology.

86.     The parents attempted to clarify this point in their motion for reconsideration, however, that, too was again denied without a hearing and this time without explanation. The denied motion for reconsideration also added that Dr. Pals had reviewed the genetic variant found by Dr. Forghani, based on his expertise in molecular genetics and biochemistry, and he determined that the variant was "likely pathogenic" meaning it is highly likely that the genetic findings would have been an underlying medical cause for the twins' fractures.

87.     It is Dr. Forghani's newly discovered genetic variant, that *could not have been detected* at the time of trial because the technology was not yet available, that forms the second basis for which the parents sought extraordinary relief, which was denied.

88.     The parents have consistently denied intentionally causing harm to the twins, and the evidence ultimately discovered after the parents were able to fully investigate the matter conclusively established that the twins injuries were the result of a metabolic bone disease from which they both suffered.

89.     If ChildNet, Inc. had not prioritized speedy termination in an effort to obtain greater financial gain, and if the DCF had shown the appropriate due care for allow sufficient time to explore relevant medical data, the Pattersons' parental rights would not have been terminated.

90.     Neither M.P, Jr., nor his mother, Mellisa Patterson, wanted the parents' rights to be terminated, and M.P., Jr. testified that he had never suffered any abuse from his parents, nor had he seen them commit any abuse.

-17-

91.     Additionally, after finding out about the judge's amended final judgment upholding the termination of parental rights, the parents were baffled as to how the Court could come to the conclusion to still terminate their parental rights, in light of the significant amount of medical testimony in their favor, much of it uncontroverted, and the DCF's burden to prove their case by *clear and convincing* evidence.

92.     The entire proceedings were fundamentally flawed and denied the Pattersons due process.

93.     The parents counsel filed a motion for rehearing/relief from judgment on January 29, 2024, to the Court pointing out expert witnesses who were not allowed to testify in trial on behalf of the parents, the timeline of medical visits the twins were taken to prior to removal, the writing of the ruling suggesting bias, and fraud from Dr. Jamelah Tucker misrepresenting her credentials.

94.     The Motion for Rehearing/Relief from Judgment was denied on February 5, 2024.

95.     The parents filed a notice of appeal with the Fourth District Court of Appeal on February 19, 2024.

96.     On or about April 9, 2025, the Fourth District Court of Appeal entered an opinion affirming the trial court's rulings and completing the State of Florida' decision to terminate the custodial and civil rights of the Pattersons to their three beautiful children.

97.     The Pattersons' story is not an isolated incident.

98.     Preexisting genetic conditions such as Ehlers-Danlos syndrome, rickets, osteogenesis imperfecta, and vitamin D deficiency can lead to signs of bodily harm that are not

due to intentional physical abuse, but the State of Florida's process for determining whether that is the case is constitutionally flawed.

99.     When there is a report of physical abuse, DCF conducts a visit and if visible bodily harm is observed, the child is immediately removed from the parent for their safety, and a 24-hour shelter follows, after which a temporary protective supervision process and lead agencies, such as ChildNet, Inc., are financially incentivized to expedite termination proceedings, which often occur with a 2-5 months.

100.     However, genetic testing that is critical to identifying preexisting conditions can take upward of six months or more to process and further testing is often needed.

101.     As a result, parents' fundamental parental rights are extinguished without any justification.

102.     All conditions precedent have been complied with or were waived.

103.     All administrative remedies have been exhausted.

### CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATION OF CIVIL RIGHTS PURSUANT TO 42 U.S.C. SECTION 1983, *INTER ALIA*

104.     Plaintiffs hereby incorporate all of the allegations contained in Paragraphs 1-103, above as if fully set forth herein.

105.     The State of Florida, DCF, ChildNet, Inc., and the GAL have implemented a policy and practice of seizing children from their custodial parents without sufficient cause to justify termination of parental rights in violation of the custodial and familial and due process rights of the children and their parents.

106.    Due to the financial incentives encompassed within the contract between ChildNet, Inc. and DCF, ChildNet, Inc. pushes for expedited termination of parental rights proceedings, and it is paid more if the proceedings result in an actual termination, and thus, there is a financial incentive for ChildNet, Inc. to turn a blind eye to evidence contradicting the alleged basis for termination.

107.    Additionally, in furtherance of the scheme, the GAL intentionally removes any volunteer guardians who disagree with the rushed termination proceedings.

108.    In cases of genetic disorders of newly born infants, the parents may not be aware of the disorders at the time of birth, and the expedited termination proceedings utilized by the State of Florida and DCF does not afford a constitutionally sufficient opportunity for parents to fully investigate alternative causes for a minor child's injury, nor does the State and DCF offer any independent expert assessment of the child's injuries before proceeding to expedited termination proceedings.

109.    Despite knowing these facts, the Defendants regularly seek to terminate the parental rights of parents on an expedited basis even when there is credible evidence that the minor child's injuries were accidental and were the result of a genetic bone disorder, making the child unusually susceptible to fractures and other injuries.

110.    Defendants are fully aware of these facts and continue to purposefully seek *expedited* termination of parental rights proceedings and frustrate the parents' ability to investigate the matter in such a reckless manner and with such gross negligence as to have deprived the Plaintiffs here of their due process rights under the U.S. and Florida constitutions.

111.    Defendants herein acted with deliberate indifference to the rights and well-being of Plaintiffs who have lost their custodial and civil rights and of their children who have lost the continued relationship with their birth parents.

112.    Defendants' rushed actions as set forth above violated the rights of due process of law guaranteed to Plaintiffs and their minor children by the Fifth and Fourteenth Amendments of the Constitution of the United States, the Florida Constitution, and 42 U.S.C. §1983, inter alia.

113.    As a direct and proximate result of the Defendants' aforesaid actions, Plaintiffs have suffered and will continue to suffer irreparable harm and damages.

114.    Irreparable injury will continue to occur without this Court's intervention.

115.    Plaintiffs have no other adequate remedies at law.

116.    Plaintiffs seek declaratory and injunctive relief.

117.     Appropriate injunctive relief in this would promote justice and the public interest.

WHEREFORE Plaintiffs request that this Court enter a judgment against Defendants and grant declaratory and injunctive relief and award attorney's fees and costs, and that this Court's judgment:

(1) declares that the cause of Ma. P.'s and Mi. P.'s injuries was a genetic bone disorder at the time of birth.

(2) prohibits the State of Florida and DCF from pursuing *expedited* termination of parental rights proceedings in cases in which there is credible evidence of a medical cause of an infant's injuries that warrants further *independent* investigation prior to a final termination being made as to the permanent termination of the custodial and civil rights of that child's parents;

(3) prohibits the State of Florida and DCF from incentivizing lead agencies to pursue termination of parental rights proceedings on an *expedited* basis in cases where a medical cause is suspected for the child's injuries;

(4) prohibits the GAL from removing volunteer guardians ad litem who oppose the termination proceedings;

(5) prohibits DCF from placing the Pattersons' children up for adoption; and

(6) allows the Pattersons to apply to adopt their minor children to remedy some of the harm caused by the Defendants' actions.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

DATED this 30th day of July, 2025.

Respectfully submitted,

/s/Henry G. Gyden
**HENRY G. GYDEN, ESQUIRE**
Florida Bar No. 0158127
GYDEN LAW GROUP, P.A.
1600 East 8th Ave.
Suite A200
Tampa, Florida 33605
(813) 493-4181
(813) 337-0244 FAX
Co-Counsel for Plaintiffs

and

/s/ Octavia O. Brown
**OCTAVIA O. BROWN, ESQ.**
FL Bar No.: 0011778
One Community Law Group, PLLC
2701 W Busch Blvd Ste 226
Tampa, Florida 33618

-22-

PH: 813-725-5080
FAX: 863-520-8228
Octavia.brown@community-lawyer.com
legalassistant@community-lawyer.com
Co-Counsel for Plaintiffs